**Walker NANCE, Appellant,**

**v.**

**Jewel F. HARGIS, Appellee**

**No. 10550.**

Court of Civil Appeals of Texas.

Austin.

Feb. 26, 1958.

Rehearing Denied March 19, 1958.

J. Hubert Lee, Austin, for appellant.

J. C. Hinsley, E. H. Smartt, Austin, for appellee.

ARCHER, Chief Justice.

This is an appeal from an order of the District Court, granting a judgment non obstante veredicto, growing out of an application to probate the nuncupative will of Paul M. Hargis, deceased. The alleged nuncupative will had been admitted to probate in the County Court and an appeal had been taken by the contestant therein and appellee herein. A trial was had in the District Court to a jury and in response to three issues the jury returned its verdict favorable to the proponent of the will.

The appeal is before this Court on four points and are that the court erred in failing to enter judgment on the jury verdict, and in failing to admit the will to probate, in granting appellee's motion and in rendering judgment not withstanding the verdict and thereby denying probate of the will of Paul M. Hargis.

Appellee has made certain counterpoints as to the submission of issues which will be later discussed.

Application was made by Walker Nance to probate the nuncupative will of Paul M. Hargis, alleging that Mr. Hargis died in Galveston, Texas, on January 29, 1956, and had made an oral will during his last sickness, having called on someone to take notice that he wanted to dictate his will, or words to that import, and that there were three credible witnesses that the testator called on a person to take notice that such was his will.

The witnesses by whom the will was sought to be established were Dr. Edward Futch, Dr. Lang F. Holland and Mrs. Pauline Hewett. We will summarize the testimony of each:

Dr. Futch:

Dr. Edward D. Futch testified by deposition that Mr. Hargis became suddenly ill on January 27, 1956, while attending a party in Galveston and Dr. Wilson was called, and he, Dr. Futch, was immediately called

in by Dr. Wilson. The doctor testified that Mr. Hargis was taken to St. Mary's Hospital about 11:00 or 12:00 o'clock suffering from an acute myocardial infection; that one may recover from such an attack; that the history of Mr. Hargis was that he had had prior attacks. Treatments were given Mr. Hargis to relieve pain and anxiety and to dilate the coronary arteries and to elevate blood pressure and to the administration of other medicines; that he talked with Mr. Hargis off and on during the days of treatment and observed him; that Mr. Hargis had remarkable self control and fully realized that he was going to die; that Mr. Hargis said that he wanted to dictate his will and dictated it directly to the witness and that he, Dr. Futch, wrote down what Mr. Hargis said and read it back to him and he approved it orally; that the instrument was signed by himself and the witnesses Dr. Holland and Mr. Schroeter; that the patient died on January 29, 1956, at about 2:45 P. M. Dr. Futch stated that Mrs. Jewel Hargis told him that Mr. Hargis wanted the doctor to come over and talk to him, and after some words the patient asked him to write down his will; that the patient dictated slow enough that there was no difficulty in writing it down, and he identified the instrument hereinafter set out as being in his writing.

Dr. Futch also testified that he wanted Dr. Holland to sign the instrument because he was a professional man and Mr. Schroeter signed it because someone said that three were needed; that at all times Mr. Hargis was under an oxygen tent; that the paper exhibited has a date on it up at the top of 1–29–56, 12:30 P. M. and the chart indicates that the patient expired at 1:45.

Dr. Holland:

Dr. Holland, who had treated Mr. Hargis for a number of years, testified that he was called to Galveston and saw Mr. Hargis who had suffered a heart attack earlier and talked to him, and that shortly before his death Mr. Hargis called on someone to take down his will; that Dr. Futch took it down, and afterwards he signed the memorandum with Dr. Holland and Paul Schroeter.

We quote from Dr. Holland's testimony:

"A. When I signed this thing, I said then that there was going to be trouble about this, because all he said was not put down, and Dr. Futch and I both commented on that. We had to do the best we could at that particular time, and that is all we could do, because we could not interrogate the man. He was too sick to be interrogated. He stated and we wrote down.

"Q. What he stated you wrote down? A. Some of the things he stated. We hit particularly the high spots.

"Q. These things on here he did state? A. Yes; but they are not all there, that is the point I am trying to make.

"Q. Do you recall whether he made any additional disposition? A. No.

"Q. You do not? A. No, sir.

"* * * He waited until he was dying before he made a will, and he can't put all the things he said in that little, short length of time into that little instrument that you have there; and, again, Dr. Futch took this thing off, and we commented at that time that all he said is not on that slip of paper. That was done in a hurry.

"Q. But you will not state that he gave any other property than that? A. I don't remember. I can't state something that I don't remember.

* * * * * *

"Q. Now, doctor, a few moments ago Mr. Lee displayed this paper to you and I believe you testified that Mr. Hargis said a lot of things that are not on that paper? A. Yes, sir.

* * * * * *

"Q. Do you recall any other gifts that may have been made that you don't find listed on this paper? A. No, sir,

I don't. There were a lot of things that were said, and I turned to Dr. Futch and said, as I said to Mr. Lee, 'There is going to be trouble, because it is not all here.' I think Mr. Schroeter was there, too.

"Q. But you are in no position to tell us in particular what was left off? A. No, sir.

"Q. It is your opinion, though, that that is not an accurate writing down of what Mr. Hargis said? A. All of it, no, sir, it is not all of it.

\* \* \* \* \* \*

"Q. It is still your testimony that not all the things that Mr. Hargis said about his property are written down there? A. It would have taken a lot larger piece of paper to write all of that down.

"Q. This is only a portion? A. This is just the highlights of it."

Mrs. Hewett:

"A. \* \* \* Paul said, 'Well, I want to dictate my will.'

"Q. And did he indicate who should take it down or anything? A. He said that he needed two witnesses and he just figured that the doctors could take it down.

\* \* \* \* \* \*

"Q. Did Paul Hargis say anything about needing any witnesses to the will? A. Yes, he said he needed two witnesses and he guessed that the doctors could be the witnesses.

"Q. Did he ask anybody to take down his statement? A. Yes, he did. He said, 'Now, write this down.'

"Q. And pursuant to that, did any one of them write it down? A. Dr. Futch wrote it down.

\* \* \* \* \* \*

"Q. Do you recall whether you saw the instrument that was written by Dr. Futch after it had been written up pursuant to the words of Paul Hargis? A. I did.

"Q. And do you recall whether anybody signed it as a witness? A. I don't recall who signed it. Somebody signed it.

"Q. But you don't recall now who signed it. Do you recall what disposition he made of his property at that time? A. The store in Austin he said he wanted fifty percent to go to his wife, Jewel, and five percent to each—I believe there were five other men—a certain percent to Mr. Paul Schroeter, and then some to these other boys, Jimmy Attra, and Gary Hanson, and Mr. Richburg, and Walker Nance.

"Q. Do you recall how much he said to Paul Schroeter? A. Twenty-five percent.

"Q. And the remaining twenty-five percent, to whom did he give that? A. Malcolm Richburg, and Walker Nance, and Jimmy Attra, and Gary Hanson.

"Q. Now, a minute ago I think you said that he had the other five percent distributed between all those people. Did you mean five percent or did you mean fifty percent? A. I meant fifty percent.

\* \* \* \* \* \*

"Q. Do you recall whether he said anything about the stock in the Waco store? A. Yes, he did.

"Q. And what did he say about it? A. He said a certain percent was to go to his wife, Jewel, and a certain percent to Paul Schroeter, and then he mentioned Mr. Kutzenberger.

"Q. But you don't recall what the percentages were? A. I think he said fifty percent to Jewel, and I can't be sure what he said to Paul Schroeter. I think I know, but I can't be sure.

\* \* \* \* \* \*

"Q. So you don't really know what they put down on paper was what Mr.

Hargis said or not? A. I know what he said about those shares was on that paper because I saw it.

"Q. And you are positive that it was put down exactly like he said it? A. Yes, sir, I think so.

"Q. Do you think so, or are you positive? A. Well, he told them what to put down and they wrote it down immediately after he said it, and I know I was right there by the side of the doctor, and I could see it, and he wrote it down.

"Q. And you are positive that they put down exactly what he said and didn't leave any out? A. The shares.

"Q. They didn't leave any out? A. I don't know whether they left any out. I remember seeing shares, the percentages, and then names by the side.

"Q. You remember seeing shares and you remember seeing percentages? A. Yes.

"Q. And you remember seeing names out there to the side? A. Yes.

"Q. Were the percentages by the names? A. I have forgotten whether they were to the side or underneath. I just don't recall that.

"Q. You don't know whether they left off anything that he said or not? A. I will tell you this: He said so much when he began to dictate this about the shares—he said, 'Doctor, take this down. This is my will'; and then he started immediately on the shares, but he said so much else and so many other things, that they didn't take near all of it down, what he said, but they took down what he said about the shares. He didn't get everything.

"Q. So the disposition of his other property didn't show up in that writing at that time, did it? A. You mean real estate?

"Q. I mean any of it. A. I didn't hear him dispose of real estate.

"Q. Well, what did he dispose of that they didn't write down? A. He disposed of the shares in his store and told them to write it down.

"Q. What else? A. And he mentioned the Waco store and told them to write it down.

\* \* \* \* \* \*

"Q. One more question. Did you see the writing in Galveston at the hospital while it was being written down sufficiently to know at that time and to be certain thereof now that whatever that instrument said was what Paul stated with regard to disposition of the stock in the two companies, the Austin company and the Waco company? A. Yes.

"Q. Mrs. Hewett, just tell us what disposition of the Waco stock was made again, please. A. I told you that I missed what he gave to Mr. Kutzenberger, because I walked over there to the cot to Mr. Hargis. If I remember right now, it seems to me it was eighty-five percent to Jewel. I can't be sure of that. I think it was eighty-five percent.

"Q. But you don't know how much he gave to Mr. Kutzenberger? A. No, I didn't hear that.

"Q. And you don't know how much he gave to Mr. Schroeter? A. It seems to me like—I told you a minute ago that it was either eighty-five or fifty to Jewel, and it seems to me it was fifteen percent—I think I am positive about fifteen percent to Mr. Schroeter.

"Q. Then it must have been about fifty percent to Mrs. Jewel Hargis? A. Likely, that's right.

"Q. But you are not sure just what he left Mr. Kutzenberger? A. I know

he left him something, but I didn't get the number of shares."

A photostatic copy of the instrument signed by Drs. Futch and Holland and Mr. Schroeter follows:

Galveston, Tex. 1-29-56 12<u>30</u> PM.

Mr. <u>Paul</u> Hargis

Personal stock in
Austin Hargis Corp
devided as follows:
50% to wife
50% to employees
divided as follows:
1. Paul Schroeter 25%
2. Remainder equally
between (a) Gary
Hanson
(b) Walker Vance
(c) Malcom Richburg
(f) Jimmy Attra

Waco stock
15% to Paul Schroeter
85% to wife
Witnessed E.V. Futch M.D.

Arthur Haug H. M.D.
Paul M. Schroeter

The contestant in answer alleged that she is the wife and sole heir of Paul M. Hargis, and that the alleged nuncupative will should not be admitted to probate, and is not the will of Paul M. Hargis; that such purported oral will was not spoken nor made under the circumstances to make it a valid will, and that at such time Paul M. Hargis was not of sound mind and was under the influence of opiates.

The court submitted to the jury three special issues, which issues and the answers thereto are as follows:

"Special Issue No. 1: Do you find from a preponderance of the evidence that at the time of the last illness of Paul Hargis the substance of the testamentary words spoken by him were as follows:

"That of the stock in Paul Hargis' personal name in the Austin store, fifty per cent should go to his wife, Jewel Hargis, twenty-five per cent to Paul Schroeter, and the other twenty-five per cent should be divided equally among the following: Gari Hanson, Walker Nance, Malcolm O. Richburg, and Jimmy Attra; and that of the stock in the Waco store fifteen percent of the stock owned by him should go to Paul Schroeter and eighty-five per cent should go to his wife, Jewel Hargis?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"Special Issue No. 2: Do you find from a preponderance of the evidence that in speaking the words pertaining to dispoistion of his property just prior to his death the deceased Paul Hargis spoke words attempting to give property to a person or persons other than those named in the written memorandum signed by Paul Schroeter and Doctor Holland and Doctor Futch?

"Answer 'Yes' or 'No.'

"Answer: No.

"Special Issue No. 3: Do you find from a preponderance of the evidence that at the time Paul Hargis spoke the words claimed to constitute his will, if you have so found, he had testamentary capacity to make a will?

"Answer 'Yes' or 'No.'

"Answer: Yes."

We quote the applicable provisions of our Probate Code:

Section 64 of the Code, V.A.T.S., provides who may dispose of personal property by a nuncupative will.

Section 65 provides:

"No nuncupative will shall be established unless it be made in the time of the last sickness of the deceased, at his home or where he has resided for ten days or more next preceding the date of such will, except when the deceased is taken sick away from home and dies before he returns to such home; nor when the value exceeds Thirty Dollars, unless it be proved by three credible witnesses that the testator called on a person to take notice or bear testimony that such is his will, or words of like import."

Section 81(c) reads:

"Nuncupative Wills. An application for probate of a nuncupative will shall contain all applicable statements above required with respect to written wills, and also:

"(1) The substance of the testamentary words spoken.

"(2) The names and residences of the witnesses thereto."

Section 86 of the Code reads:

"Proof of Nuncupative Will.

"(a) Notice and Proof of Nuncupative Will. No nuncupative will shall be proved within fourteen days after the death of the testator, or until those

who would have been entitled by inheritance, had there been no will, have been summoned to contest the same, if they desire to do so.

"(b) Testimony Pertaining to Nuncupative Wills. After six months have elapsed from the time of speaking the alleged testamentary words, no testimony shall be received to prove a nuncupative will, unless the testimony or the substance thereof shall have been committed to writing within six days after making the will.

"(c) When Value of Estate Exceeds Thirty Dollars. When the value of the estate exceeds Thirty Dollars, a nuncupative will must be proved by three credible witnesses that the testator called on a person to take notice or bear testimony that such is his will, or words of like import."

Appellant takes the position that the words spoken by the deceased constituted a nuncupative will, and that such was proved by three credible witnesses, and that the testator had called on a person to take notice or bear testimony that such was his will, or words to that import, and relies on the memorandum made by Dr. Futch and the testimony as given by Dr. Holland, Dr. Futch and Mrs. Hewett.

The latest case we have had cited to us is McClain v. Adams, 135 Tex. 627, 146 S. W.2d 373, Commission of Appeals of Texas, Section A, opinion adopted by the Supreme Court, which sets out appropriate provisions of a number of cases therein cited, as in Mitchell v. Vickers, 20 Tex. 377, where it is stated:

"Nuncupative wills are not favorites of the law. But as they are authorized by the statute, they must, when duly proved, be allowed and established. They are hedged round with numerous restrictions, to guard against the frauds for which oral wills offer so many facilities; and it is a well established rule,

that strict proof is required of all the requisites prescribed by the law. * *

"It may be laid down as a general rule, that the testimony of the witnesses must agree, at least substantially, as to the words spoken, or the dispositions made by the deceased. There can be no will, no disposition of the property, if the witnesses cannot concur as to what, in substance, was such disposition."

■ As we have stated, it is apparent that Mr. Hargis intended to make a will and the proof as above summarized tends to support the same as a nuncupative will and sufficiently so, in our opinion, to support the verdict of the jury establishing the will.

Appellee requested the submission of the following issue to the jury:

"Do you find from a preponderance of the evidence that the testamentary words spoken by Paul M. Hargis immediately prior to his death, if you find any such were spoken, were substantially as follows:

" 'Personal stock in Austin Hargis Corp. divided as follows: 50% to wife, 50% to employees divided as follows:

" '1. Paul Schroeter 25%
" '2. Remainder equally between
" '(a) Gary Hanson
" '(b) Walker Nance
" '(c) Malcolm Richburg
" '(d) Jimmy Attra
" 'Waco Stock 15% to Paul Schroeter
85% to wife?'
"Answer 'Yes' or 'No.' "

■ In our opinion there is no substantial difference between this requested issue and the issue submitted by the Court, however, we will gladly entertain a motion by appellee to reform the judgment so as to make it conform to the language of the requested issue.

Appellee also requested submission of the following issues:

"Requested Special Issue No. 6

"Do you find from a preponderance of the evidence that any three witnesses who testified in this case, in person or by deposition, agreed without substantial difference in their testimony as to the persons to whom Paul M. Hargis was attempting to give his property by the testamentary words spoken shortly before his death, if you have found that he spoke any such words?

"Answer 'Yes' or 'No.'

"Requested Special Issue No. 7

"Do you find that the three witnesses, Dr. L. F. Holland, Dr. Edward D. Futch, and Mrs. Pauline Hewett, are in substantial agreement in the testimony given by them in these causes with respect to details of the words spoken by Paul M. Hargis before his death concerning the property he wished to dispose of and the identity of the persons to whom he wished to give such property?

"Answer 'Yes' or 'No.' "

It is our opinion that these requested issues were properly refused since the Court correctly submitted the substance of the requested issues.

We have previously overruled appellee's motion to strike the transcript and statement of facts for informalities in their preparation. None of these objections goes to the merits of the appeal nor to a fair presentation of the case and appellee shows no harm as a result of the manner in which they were prepared. These points are overruled.

We also overrule appellee's objection to appellant's points in his brief as being multifarious, duplicitous and too general. We do not critically examine the structure of points when, as here, neither

appellee nor we have any difficulty in understanding their meaning.

The judgment of the Trial Court is reversed and judgment is here rendered in accordance with the verdict of the jury.

Reversed and rendered.